# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Barbara Circiello**<br><br>Plaintiff<br><br>v.<br><br>**Louis Alfano, Jr., M.D. and Hallmark Health Systems, Inc.,**<br><br>Defendants | **Case No:**<br><br>**COMPLAINT UNDER THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Barbara Circiello, by her attorney, Domenic Paolini, Esquire, for her complaint, alleges as follows:

## I.     NATURE OF THE ACTION

1.     This action arises from a scheme by which the plaintiff, Barbara Circiello, was defrauded of $10 million, representing her damages for the Wrongful Death of her father, Raymond DiGiovanni, who died in 1995 as the result of uncontrolled internal bleeding following surgery that was performed by the Defendant, Louis Alfano, Jr., M.D.

2.     The uncontrolled internal bleeding that killed Mr. DiGiovanni was the result of medical malpractice in the performance of a routine laparoscopic cholecystectomy, that is, the surgical removal of Mr. DiGiovanni's gallbladder using a laparoscope.

3.     Instead of informing Mr. DiGiovanni's family of the complication that occurred during surgery and the resultant internal bleeding, the Defendant, Louis Alfano, Jr., M.D., concealed the true cause of death, and falsely represented to the family that Mr. DiGiovanni died as the result of natural causes, namely cirrhosis of the liver, liver failure and kidney failure.

4.     The Defendant, Louis Alfano, Jr., M.D., made these false representations to the DiGiovanni family for the sole purpose of dissuading and preventing the DiGiovanni family from pursuing a claim of medical malpractice against him.

5.   The Defendant, Louis Alfano, Jr., M.D., with the help of an enterprise comprised of a gang of conspirators, was allowed to operate negligently, but with impunity, to the detriment of many patients at Melrose-Wakefield Hospital over the course of almost seventeen (17) years.

6.   The Plaintiff, Barbara Circiello, is filing this complaint, through her attorney, seeking justice for the death of her father, Raymond DiGiovanni. What other racketeers accomplish with guns and stilettos, Louis Alfano, Jr., M.D., accomplished with a laparoscope and scalpel; what other racketeers accomplish through false alibi witnesses, Louis Alfano, Jr., M.D., accomplished through Melrose-Wakefield Hospital and his partner, Alfonso Serrano, M.D.; what other racketeers accomplish through guns-for-hire, Louis Alfano, Jr., M.D., accomplished through paid expert witnesses; what other racketeers accomplish through their inflated and notorious reputations in the community, Louis Alfano, Jr., M.D., accomplished through his father Louis Alfano, Sr., M.D., and an organization known as the American Board of Abdominal Surgery, Inc.

   *a.*   ***Brief Background History***

7.   In the 1950s, Louis Alfano, Sr., M.D., father of the Defendant, Louis Alfano, Jr., M.D., and his brother Blaise Alfano, M.D., became prominent surgeons in the Melrose community and practiced at Melrose-Wakefield Hospital in Melrose, Massachusetts. Louis Alfano, Sr., M.D., was a member of the Board of Trustees of Melrose-Wakefield Hospital and was President of the Massachusetts Medical Society in 1975-1976.

8.   In or around 1958, Louis Alfano, Sr., M.D., and Blaise Alfano, M.D., formed an organization known as the American Board of Abdominal Surgery. This organization, whose name is confusingly similar to the legitimate American Board of Surgery, provided "board" certifications to surgeons who would otherwise not qualify for board certification by the mainstream American Board of Surgery.

9.   In 1977, Louis Alfano, Sr., M.D.'s son, the Defendant, Louis Alfano, Jr., applied to medical school. However, when he was not accepted at any United States Medical School, he enrolled in medical school in Guadalajara, Mexico. The Defendant, Louis Alfano, Jr., graduated from the Mexican medical school in 1981 but, in order to be licensed in the United States, he had to complete one clinical year in the United States. He completed this required clinical year at Framingham Union Hospital and, in 1983, the Defendant, Louis Alfano, Jr., M.D., was issued a license to practice medicine in the Commonwealth of Massachusetts.

10.   In 1983, the Defendant, Louis Alfano, Jr., M.D., enrolled in a surgical residency training program at St. Vincent's Hospital in Bridgeport, Connecticut. He completed that program in 1989 but, for unknown reasons, St. Vincent's Hospital lost its surgical residency training program that same year.

11.     In 1990, the Defendant, Louis Alfano, Jr., M.D., was back in Melrose, Massachusetts, practicing surgery at the Melrose-Wakefield Hospital. Despite his mediocre training and lack of professional experience, Dr. Alfano, Jr., was appointed President of the Credentials Committee, President of the Melrose-Wakefield Independent Practice Association, and a member of the Quality Control Committee. These hospital committees decided, among other things, which procedures each surgeon would be permitted to perform at Melrose-Wakefield Hospital and how each surgeon's quality of care and performance should be monitored, measured and, if necessary, corrected.

12.     Between 1994 and 1996, the Defendant, Louis Alfano, Jr., M.D., was appointed President of Melrose-Wakefield Hospital.

13.     Between 1996 and 1998, the Defendant, Louis Alfano, Jr., M.D., was appointed President of the Hallmark Health Systems, Inc.'s medical staff.

14.     In 1995, the Defendant, Louis Alfano, Jr., M.D., became President of the American Board of Abdominal Surgery, which he and his father controlled after the death of Blaise Alfano, M.D., in 1993.

15.     Eventually, Melrose-Wakefield Hospital appointed the Defendant, Louis Alfano, Jr., M.D., to the positions of Chief of Minimally Invasive Surgery and Chief of Surgery at Melrose Wakefield Hospital.

16.     In 1996, the Defendant, Louis Alfano, Jr., M.D., became president of Melrose Surgical Associates, a group practice that included Alfonso Serrano, M.D.

17.     The leadership positions referenced in paragraphs 11 through 16, *supra*, were given to the Defendant, Louis Alfano, Jr., M.D., because of his father's influence at the Melrose-Wakefield Hospital and in the Massachusetts medical community.

### b.     The Death of Raymond DiGiovanni

18.     On March 1, 1995, the Defendant, Louis Alfano, Jr., M.D., assisted by Alfonso Serrano, M.D., performed laparoscopic cholecystectomy on Raymond DiGiovanni. Over the twenty four (24) hours after surgery, Raymond DiGiovanni bled to death as the direct result of massive internal bleeding and other surgical complications caused by the Defendant, Louis Alfano, Jr., M.D.'s negligence during surgery. Before he died, Raymond DiGiovanni received over thirty (30) units of blood and other blood products.

19.     The Defendant, Louis Alfano, Jr., M.D., dictated and/or made intentional omissions and false and misleading statements in Raymond DiGiovanni's patient care record and Death Certificate concerning the events surrounding Raymond DiGiovanni's hospitalization, surgery, and death in March 1995.

20.     The Melrose-Wakefield Hospital patient care record was written in a manner that would lead Mr. DiGiovanni's family to conclude, incorrectly, that he died as a result of natural causes, specifically including severe cirrhosis, end stage liver failure and kidney failure, and not as a result of a surgical complication, i.e., uncontrolled bleeding from an operation that was not medically indicated and not performed competently.

21.     The Defendant, Louis Alfano, Jr., M.D., made false statements to the DiGiovanni family and omitted material information from the medical record believing that the DiGiovanni family would sue him for medical malpractice, and that he could face professional discipline, if the true cause of Mr. DiGiovanni's death was revealed.

22.     Raymond DiGiovanni's family, including the plaintiff, Barbara Circiello, believed and relied on the Defendant, Louis Alfano, Jr., M.D.'s false statements and material omissions to their detriment, and were thus dissuaded and prevented from filing suit against the Defendant, Louis Alfano, Jr., M.D., for his negligence prior to the running of the applicable statute of limitations and statute of repose (M.G.L. c.260 § 4).

### c.      The Enterprise

23.     The Defendant, Louis Alfano, Jr., M.D., conducted and/or participated directly or indirectly in the affairs of an enterprise through a pattern of racketeering activity, and/or conspired to do so, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*. This enterprise consisted of a group of conspirators, all of whom participated in the promotion and protection of the Defendant, Louis Alfano, Jr., M.D., and collectively was the instrumentality by which Dr. Alfano defrauded the plaintiff, Barbara Circiello.

24.     The Defendant, Louis Alfano, Jr., M.D., was able to make false and misleading statements in the medical record and Death Certificate of Raymond DiGiovanni with impunity because of his position in the Melrose-Wakefield Hospital, which failed to conduct appropriate and timely review of his deceptive records and actions. In addition, Melrose-Wakefield Hospital never questioned why so many patients under the Defendant, Louis Alfano, Jr., M.D.'s care required transfer to other hospitals for lifesaving care or re-operation after he performed surgery on them.

25.     Louis Alfano, Sr., M.D. promoted and covered for his son even though he injured many patients, including Raymond DiGiovanni.

26.     The American Board of Abdominal Surgery provided the Defendant, Louis Alfano, Jr., M.D., with credentials and a façade of competence.

27.     Alfonso Serrano, M.D., the Defendant, Louis Alfano, Jr., M.D.'s partner, assisted him as he performed many operations at Melrose-Wakefield Hospital.

28.     The Medical Liability Mutual Insurance Company, and possibly other insurers, provided professional liability insurance to the Defendant, Louis Alfano, Jr., M.D. As such, the Medical Liability Mutual Insurance Company provided funding for fraudulent defenses, fraudulently caused patients who were injured by the Defendant, Louis Alfano, Jr., M.D. to expend time and money as they prosecuted their cases against him and breached the covenant of fair dealing owed to the patients injured by the Defendant, Louis Alfano, Jr., M.D.

29.     Between 2003 and 2007, the Board of Registration in Medicine (hereinafter "BORM") investigated the Defendant, Louis Alfano, Jr., M.D., and summarily suspended him from the practice of surgery before placing him on a five year probationary period during which his practice of surgery is severely restricted.

30.     On multiple occasions when the Defendant, Louis Alfano, M.D., was investigated and/or prosecuted by the Board of Registration in Medicine, or sued for medical malpractice, Dr. David Brooks of the Brigham and Women's Hospital, a member of the enterprise, would provide supportive expert opinions and testimony in Dr. Alfano's defense.

### d.     Damages

31.     As a consequence of the Defendant, Louis Alfano, Jr., M.D.'s and the Defendant, Hallmark Health System, Inc.'s unlawful conduct, and with the help of the enterprise, the Plaintiff, Barbara Circiello, was defrauded of $10 million, representing the Wrongful Death damages she would have been entitled to were she not defrauded of the opportunity to file suit against the Defendant, Louis Alfano, Jr., M.D., in a timely fashion.

32.     Ms. Circiello now seeks relief, including actual, punitive, and treble damages, along with her costs and attorneys' fees in investigating and prosecuting this action.

33.     The Defendants, Louis Alfano, Jr., M.D., and Hallmark Health Systems, Inc., also committed common law fraud by making false statements and/or allowing intentional omissions and false and misleading statements to be made in Raymond DiGiovanni's patient care record and Death Certificates concerning the events surrounding Raymond DiGiovanni's hospitalization, surgery, and death at Melrose-Wakefield Hospital in March 1995.

## II.     THE PARTIES

34.     The Plaintiff, Barbara Circiello, the sole surviving heir of Raymond DiGiovanni, resides in Revere, Massachusetts.

35.     The Defendant, Louis Alfano, Jr., M.D., resides at 125 Chestnut Street, Wakefield, Massachusetts.

36.     The Defendant, Hallmark Health System, Inc., is a Massachusetts corporation with a principal place of business at 170 Governors Avenue, Medford, Massachusetts. On information and belief, Hallmark Health System, Inc., is the parent corporation of Melrose-Wakefield Hospital.

## III.     JURISDICTION AND VENUE

37.     This Court has original jurisdiction to hear the Complaint pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

38.     Jurisdiction of the state law claims is founded upon the supplemental jurisdiction of the Court pursuant to 28 U.S.C. § 1367.

39.     Venue of this action lies in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a).

## IV.     FACTUAL BASIS FOR CLAIMS

### *Louis Alfano, Sr., M.D., Becomes the "Godfather" of the Melrose Medical Community*

40.     Louis Alfano, Sr., M.D., father of the Defendant, Louis Alfano, Jr., M.D., graduated from Tufts Medical School in 1946.

41.     Blaise Alfano, M.D., uncle of the Defendant, Louis Alfano, Jr., M.D., graduated from Tufts Medical School in 1950.

42.     Eventually, in or around 1954, Blaise Alfano, M.D., established a surgical practice in Melrose, Massachusetts and practiced at Melrose-Wakefield Hospital.

43.     Eventually, Louis Alfano, Sr., M.D., established a "Gynecology and Obstetrics" practice at 665 Main Street, Melrose, Massachusetts (see Exhibit 1), and practiced at Melrose-Wakefield Hospital. Upon information and belief, Louis Alfano, Sr., M.D., practiced at Melrose-Wakefield Hospital at least until July 2003 when he was over eighty (80) years old.

44.     Louis Alfano, Sr., M.D., eventually became a member of the Board of Directors of Melrose-Wakefield Hospital.

45.     Between 1975 and 1976, Louis Alfano, Sr., M.D., became the President of the Massachusetts Medical Society.

### *Louis Alfano, Sr., M.D., and Blaise Alfano, M.D.,*
### *Establish Their Own Certification Organization*

46.     In or around 1958, Blaise Alfano, M.D., was involved in the incorporation of the "American Board of Abdominal Surgery" (hereinafter "ABAS") in the State of Delaware. This organization's name is deceptively similar to the "American Board of Surgery"

(hereinafter "ABS"), the organization which legitimately awards Board Certification to qualified surgeons in the United States. The ABS is a member board of the American Board of Medical Specialties (hereinafter "ABMS").

47. The ABAS web site (http://www.abdominalsurg.org/board.html) states, "[f]ollowing completion of a Residency in General Surgery, as outlined in the American Medical Association Graduate Medical Education Directory and reviewing the qualifications to sit for the examinations of the American Board of Surgery, one realizes this educational requirement is too broad in its scope. Specialization must be more defined and refined. The specialty of General Surgery, as defined in the American Medical Association Graduate Medical Education Directory, lists fifteen plus areas of 'training', one of which is the abdomen and its contents, including the alimentary tract. There exists today only the American Board of Abdominal Surgery which restricts certification to those surgeons who qualify for and pass the examinations and limit their surgical practice to abdominal surgery".

48. In accordance with these rules, surgeons could obtain "certification" from the ABAS, without being required to demonstrate competence in any of the other fourteen areas of training that the ABS requires for certification.

49. The ABAS web site further states, "[t]he Board establishes definition, standards and requirements which abolishes the confusion existing as to who is qualified to perform Abdominal Surgery. This will no doubt help to solve the bitter controversies and petty squabbles that continue to exist between segments of the profession and which have not been solved by previously existing organizations and methods."

50. In accordance with these rules, the ABAS would allow surgeons who are disqualified by the stringent standards of the legitimate American Board of Surgery to become "certified" and therefore "qualified" to perform abdominal surgery. The ABAS issued these "certifications" nationally and internationally.

51. The ABAS issued 2,265 "Diplomate Certificates" to members of a "Founders Group" who supposedly had "demonstrated their qualification and proficiency to become Diplomates of the American Board of Abdominal Surgery". As one such recipient, Blaise Alfano, M.D., then advertised himself as a "Board Certified" abdominal surgeon to the Melrose community.

52. Since 1934, medical specialties boards in the United States have been officially approved jointly by action of the ABMS and the American Medical Association Council on Medical Education (hereinafter "AMA/CME"). This process begins with review by the Liason Committee for Specialty Boards (LCSB), an organization sponsored jointly by the ABMS and the AMA.

53. The ABAS petitioned the LCBS to become a member of the ABMS. This petition was *denied*. However, to minimize this failure, the ABAS website explains, "The ABAS Petition to the LCSB was denied in a most cavalier fashion. An appeal will be presented within the time frame. Diplomates are requested to place on their stationery: Diplomate,

American Board of Abdominal Surgery." Thus, the ABAS encouraged its "certified" surgeons to deceive and confuse their patients.

54.  For many years, the ABAS operated from a storefront on the corner of East Emerson and Main Streets in Melrose, Massachusetts, just five hundred feet from Melrose-Wakefield Hospital. The site is still marked with a large brass plaque on the East Emerson side of the building. (Exhibit 2)

55.  The ABAS spawned other organizations, all with sound alike names, including the "American Society of Abdominal Surgeons", "American Association of Abdominal Surgeons", the "American College of Abdominal Surgeons", the "American Academy of Abdominal Surgeons", the "International Board of Abdominal Surgeons", and the "International College of Abdominal Surgeons". All of these organizations shared a small leadership group that included the Defendant, Louis Alfano, Jr., M.D., and his father, Louis Alfano, Sr., M.D.

56.  The Defendant, Louis Alfano, Jr., M.D., became an officer in the corporations known as the "American Board of Abdominal Surgery, Inc." and the "American Society of Abdominal Surgery, Inc."

57.  In 1995, the Defendant, Louis Alfano, Jr., M.D., became President of the ABAS.

58.  Although the Defendant, Louis Alfano, Jr., M.D., completed his surgical training in 1989 at a defunct surgical training program, by 1995 he was in a position to hand out "board certifications" through the ABAS. This position provided the Defendant, Louis Alfano, Jr., M.D., with a facade of competence and respectability at Melrose-Wakefield Hospital and in the Melrose community.

59.  The Defendant, Louis Alfano, Jr., M.D.'s association with the ABAS also provided him with significant income from applications and renewals from surgeons who sought out certification by the ABAS.

60.  In order to keep up the appearance of legitimacy, the "American Society of Abdominal Surgeons" published its own medical journal, the "Journal of Abdominal Surgery".

61.  As late as spring 2007, the American Board of Abdominal Surgery, Inc., listed "Demostene Romanucci, M.D." as its Editor-in-Chief. However, in 1997, Demostene Romanucci, M.D., was charged by the New York State Board for Professional Medical Conduct "with eight specifications of professional misconduct" including "gross negligence" and "gross incompetence." Demostene Romanucci, M.D., did not contest the charges against him and agreed that he would "no longer provide any medical care or treatment to patients, nor . . . perform any surgical procedures on patients." (Exhibit 3)

62.  Eventually, the Defendant, Louis Alfano, Jr., M.D., became the Editor-in-Chief of the Journal of Abdominal Surgery, further bolstering his position in the Melrose medical community.

***Louis Alfano, Jr., Has Ambitions To Become A Surgeon And, With Help From Melrose-Wakefield Hospital, Is Quickly Placed At The Top Of The Melrose Medical Community***

63.     The Defendant, Louis Alfano, Jr., M.D., was born in Melrose on December 30, 1954.

64.     In September 1973, the Defendant, Louis Alfano, Jr., began college at the University of Oregon. In 1975 he transferred to Boston College and graduated with a degree in biology in 1977.

65.     In 1977, the Defendant, Louis Alfano, Jr., applied to medical school but he was not accepted to any medical schools in the United States.

66.     In January 1978 he enrolled in the *Universidad Autonoma de Guadalajara* School of Medicine in Guadalajara, Mexico. The medical curriculum there consisted of two years of basic sciences, followed by two years of clinical sciences training.

67.     In March 1980 and June 1980, Louis Alfano, Sr., M.D., arranged for his son, the Defendant, Louis Alfano, Jr., to do surgery and radiology rotations at Melrose-Wakefield Hospital.

68.     Between July 1980 and September 1980, Louis Alfano, Sr., M.D., arranged for his son, the Defendant, Louis Alfano, Jr., to do medical rotations at Framingham Union Hospital.

69.     Between January 1981 and June 1981, the Defendant Louis Alfano, Jr., did medical school rotations at the William Beaumont Hospital in Michigan.

70.     The Defendant, Louis Alfano, Jr., was granted his Physician-Surgeon Diploma by the *Universidad Autonoma de Guadalajara* in December 1981. However, in order to obtain a medical license in the United States, the Defendant, Louis Alfano, Jr., M.D., had to complete a "Fifth Pathway", a program that allowed foreign medical graduates to obtain state licenses after completing an additional year of clinical study in an approved Fifth Pathway program in the United States.

71.     Upon information and belief, the Defendant, Louis Alfano, Jr., M.D., completed his Fifth Pathway requirements between January 1982 and December 1982 at Framingham Union Hospital and other hospitals associated with the Boston University School of Medicine, which, at the time, offered a Fifth Pathway program for foreign medical graduates.

72.     In March 1983, the Commonwealth of Massachusetts issued the Defendant, Louis Alfano, Jr., M.D., a full license to practice medicine.

73.     In June 1983, the Defendant, Louis Alfano, Jr., M.D., began a general surgical residency at St. Vincent's Hospital in Bridgeport, Connecticut.

74.     In 1986, the Defendant, Louis Alfano, Jr., M.D., had to interrupt his training at St. Vincent's Hospital. Upon information and belief, Louis Alfano, Sr., M.D., arranged for his son to do a "Research Fellowship in Wound Healing" between June 1986 and December 1986 at Westminster Hospital, London, England.

75. Upon information and belief, in or around 1989, the Defendant, Louis Alfano, Jr., M.D., completed his surgical residency. Soon thereafter, St. Vincent's Hospital lost its surgery residency program and is still without one.

76. Following his training at the now defunct surgical training program at St. Vincent's Hospital, the Defendant, Louis Alfano, Jr., M.D., was back in Melrose, practicing surgery at Melrose-Wakefield Hospital.

77. Upon information and belief, in 1990, Melrose-Wakefield Hospital and/or Hallmark Health System, Inc., "appointed" the Defendant, Louis Alfano, Jr., M.D., the President of the "Credentials Committee" of Melrose-Wakefield Hospital. (Exhibit 4)

78. Upon information and belief, in 1990, Melrose-Wakefield Hospital and/or Hallmark Health System, Inc., "appointed" the Defendant, Louis Alfano, Jr., M.D., the "President of the Melrose-Wakefield Tufts IPA (Independent Practice Association)." (Exhibit 4)

79. Upon information and belief, in 1990, Melrose-Wakefield Hospital and/or Hallmark Health System, Inc., "appointed" the Defendant, Louis Alfano, Jr., M.D., a "member" of the "Quality Assurance Committee" of Melrose-Wakefield Hospital. (Exhibit 4)

80. Upon information and belief, in 1990, Melrose-Wakefield Hospital and/or Hallmark Health System, Inc., "appointed" the Defendant, Louis Alfano, Jr., M.D., a "member" of the "Quality Control Committee" of Melrose-Wakefield Hospital. (Exhibit 4)

81. In 1992, the Defendant, Louis Alfano, Jr., M.D., was certified in general surgery by the ABS.

82. Upon information and belief, in 1994, Melrose-Wakefield Hospital and/or Hallmark Health System, Inc., "appointed" the Defendant, Louis Alfano, Jr., M.D., the "President of Melrose-Wakefield Hospital." (Exhibit 4)

83. Upon information and belief, in 1996, Melrose-Wakefield Hospital and/or Hallmark Health System, Inc., "appointed" the Defendant, Louis Alfano, Jr., M.D., the "President of Hallmark Medical Staff." (Exhibit 4)

84. Eventually, Melrose-Wakefield Hospital and/or Hallmark Health System, Inc., "appointed" the Defendant, Louis Alfano, Jr., M.D., the chairman of the "Operating Room Committee" of Melrose-Wakefield Hospital. (Exhibit 4)

85. Eventually, Melrose-Wakefield Hospital and/or Hallmark Health System, Inc., "appointed" the Defendant, Louis Alfano, Jr., M.D., to the "Patient Care Committee" of Melrose-Wakefield Hospital. (Exhibit 4)

86. Eventually, Melrose-Wakefield Hospital and/or Hallmark Health System, Inc., "appointed" the Defendant, Louis Alfano, Jr., M.D., the "Chief of Minimally Invasive Surgery" at Melrose-Wakefield Hospital. (Exhibit 4)

87.     Eventually, Melrose-Wakefield Hospital and/or Hallmark Health System, Inc., "appointed" the Defendant, Louis Alfano, Jr., M.D., the "Associate Chief of Surgery" at Melrose-Wakefield Hospital. (Exhibit 4)

88.     Eventually, Melrose-Wakefield Hospital and/or Hallmark Health System, Inc., "appointed" the Defendant, Louis Alfano, Jr., M.D., the "Chief of Surgery" at Melrose-Wakefield Hospital. (Exhibit 4)

89.     Louis Alfano, Sr., M.D., was instrumental in making sure that Melrose-Wakefield Hospital and/or Hallmark Health System, Inc., appointed his son, the Defendant, Louis Alfano, Jr., M.D., to these very important and influential committees and positions, notwithstanding his son's lack of experience, credentials, and professional expertise.

90.     Upon information and belief, between 1992 and 1994, the Defendant, Louis Alfano, Jr., M.D., practiced with his father at 663 Main Street, Melrose, Massachusetts.

91.     Upon information and belief, in 1995, the Defendant Alfano, Jr., M.D., moved his practice to 814 Main Street, Melrose, Massachusetts and advertised himself as a surgeon specializing in "General & Laparoscopic Surgery." (Exhibit 5)

92.     Despite his claims, the Defendant, Louis Alfano, Jr., M.D., was unqualified to perform laparoscopic surgery.

93.     On October 1, 1996, the Defendant, Louis Alfano, Jr., M.D., became President of Melrose Surgical Associates, P.C., a surgical practice located at 50 Rowe Street, Suite 100, Melrose, Massachusetts.

94.     On October 1, 1996, Alfonso Serrano, M.D., became Secretary and Registered Agent of Melrose Surgical Associates, P.C.

95.     On April 16, 2004, a patient filed a medical malpractice suit (MICV2004-01632) against the Defendant, Louis Alfano, Jr., M.D. According to the Commonwealth of Massachusetts Trial Court Information Center, the Defendant, Louis Alfano, Jr., M.D., settled with the plaintiff in this case.

96.     Case MICV2004-01632 is an example of how the Defendant, Louis Alfano, Jr., M.D., and the enterprise, conspired to defraud patients whom he had injured. According to publicly available documents filed by the parties in this case:

    a.      The Defendant, Louis Alfano, Jr., M.D., performed gall bladder surgery on the plaintiff "without ordering standard diagnostic tests prior to the procedure and then failed to perform post operative tests to determine the success of the operation".

    b.      In his operative note, dictated one month after the operation, the Defendant, Louis Alfano, Jr., M.D., stated, "The patient had an acutely inflamed gallbladder with edematous walls with an area of stones noted within the gallbladder."

    c.      However, the pathology report states, "No calculi [stones] are identified."

    d.      For over two years after the operation, the patient suffered with abdominal symptoms.

    e.      Thirty (30) months later, on November 13, 2002, the patient underwent a second operation at the Massachusetts General Hospital. At that operation, it was found that the Defendant, Louis Alfano, Jr., M.D., had left part of the gallbladder, and the stones, in the patient.

    f.      When this injured patient filed suit, the enterprise was ready to protect and defend the Defendant, Louis Alfano, Jr., M.D.

        i.      Melrose-Wakefield Hospital never investigated the Defendant, Louis Alfano, Jr., M.D., when his clinical and operative findings did not correspond with the findings of the pathologists.

        ii.      The Defendant, Louis Alfano, Jr., M.D., represented to the Middlesex Superior Court that David Brooks, M.D. would testify that he complied with the standard of care in his management of the plaintiff's chronic cholecystitis and that the Defendant, Louis Alfano, Jr., M.D.'s performance of a laparoscopic cholecystectomy was done appropriately and that nothing further was required of the Defendant, Louis Alfano, Jr., M.D.

        iii.      The Defendant, Louis Alfano, Jr., M.D., represented to the Middlesex Superior Court that David Brooks, M.D. would rebut any testimony by the plaintiff's experts suggesting that Dr. Alfano was negligent in his performance of the laparoscopic cholecystectomy.

94.    On May 10, 2004, another patient filed a medical malpractice suit (MICV2004-01967) against the Defendant, Louis Alfano, Jr., M.D. According to the Commonwealth of Massachusetts Trial Court Information Center, the Defendant, Louis Alfano, Jr., M.D., settled with the plaintiff in this case.

97.    Between 2003 and 2006, three patients filed complaints, against the Defendant, Louis Alfano, Jr., M.D., with the BORM. These patients were identified by the BORM as "Patient A", "Patient B" and "Patient C" in the proceeding styled as <u>In the Matter of Louis F. Alfano, Jr., M.D.</u>, Adjudicatory Case No. 207-006 (RM-07-60).

98.    Despite the complaints related to the Defendant, Louis Alfano, Jr., M.D., and the BORM investigation, the Melrose-Wakefield Hospital continued to promote his prowess with a laparoscope and as a surgeon.

99.    As late as 2005, the Melrose-Wakefield Hospital, and its parent corporation, Hallmark Health System, Inc., were still promoting the Defendant, Louis Alfano, Jr., M.D., as a leader in the field of laparoscopic surgery in its newsletter, *Perspectives, A Community Newsletter Of Hallmark Health*, which it publishes to the local community. (Exhibit 6)

100.    Hallmark Health System Inc.'s deceptive marketing statements included statements that the Defendant, Louis Alfano, Jr., M.D., "pioneered laparoscopic surgery in the early 1990's" and that he is "one of the region's most experienced laparoscopic surgeons." (Exhibit 6, pages 6 and 12)

101.    On September 20, 2006, as a result of the aforementioned civil complaints and the subsequent investigation by the BORM, the Defendant, Louis Alfano, Jr., M.D., voluntarily entered into an agreement with the BORM not to practice medicine in the Commonwealth of Massachusetts. This voluntary agreement expired on January 17, 2007. (Exhibit 7)

102.    A new Voluntary Agreement Not to Practice Medicine was executed on January 10, 2007 which was to expire on January 24, 2007. (Exhibit 8)

103.    On January 24, 2007, the BORM, based upon its investigation of the substandard care the Defendant, Louis Alfano, Jr., M.D., provided to Patient A, Patient B and Patient C, summarily suspended him from the practice of medicine. The BORM concluded that "the health, safety, and welfare of the public necessitates said suspension." (Exhibit 9)

104.    On June 6, 2007, the BORM "indefinitely suspended" the Defendant, Louis Alfano, Jr., M.D., from the practice of medicine. (Exhibit 10)

105.    On August 1, 2007, the BORM stayed the Defendant, Louis Alfano, Jr., M.D.'s suspension when he entered into a probation agreement (Exhibit 11) with the BORM. The probation agreement severely restricted the Defendant, Louis Alfano, Jr., M.D.'s practice of surgery by requiring him to:

    a)    be monitored by the BORM until at least July 25, 2012, and for such further period thereafter as the Board shall for reasonable cause order;

    b)    complete a course, approved in advance by the BORM, on breast cancer surgery;

    c)    engage in the practice of medicine only under such conditions as the BORM may impose;

    d)    perform surgery only at Melrose-Wakefield Hospital;

    e)    limit his surgical practice to forty hours per month of operative time;

    f)    not perform any office-based surgery that is scheduled to take longer than forty minutes or which requires sedation or anesthesia other than local anesthesia;

    g)    be monitored by Pramachandra Shah, M.D., who is now Chief of Surgery at Melrose-Wakefield Hospital;

    h)    to meet with the BORM-approved monitor to discuss all planned surgeries, including office-based surgeries;

i)       not perform any surgery which has not been approved in advance by the BORM-approved monitor and to not perform any surgery without assistance by a board-certified surgeon when the BORM-approved monitor has determined that one is required;

j)       dictate the operative note for each surgery on the same day that the surgery is performed and to send each operative report to the BORM-approved monitor within twenty-four hours of signing the dictation; and

k)       have the BORM-approved monitor review all of his notes pertaining to post-operative care, including office visits.

106.    Despite Hallmark Health System. Inc.'s previous supportive, but nevertheless deceptive, public statements concerning the Defendant, Louis Alfano, Jr., M.D.'s prowess with a laparoscope, Hallmark Health System, Inc., has never publicly acknowledged:

a)       the complaints against the Defendant, Louis Alfano, Jr., M.D.;

b)       his removal from the staff of Melrose Wakefield Hospital;

c)       his removal from his position as Chief of Surgery at Melrose-Wakefield Hospital;

d)       the disciplinary actions taken against him by the BORM;

e)       the summary suspension of his license for reasons of public safety;

f)       his removal from Melrose Surgical Associates; or

g)       the restrictions placed on his practice by the BORM.

107.    Melrose-Wakefield Hospital, despite claiming to be a "community" hospital never prepared a press release informing the community about the Defendant, Louis Alfano, Jr., M.D.'s removal from his position as Chief of Surgery or that he no longer was practicing at the hospital.

108.    Melrose-Wakefield Hospital, despite claiming to be a "community" hospital never prepared an internal memorandum or other information sheet informing the internal hospital community about the Defendant, Louis Alfano, Jr., M.D.'s removal from his position as Chief of Surgery or that he no longer was practicing at the hospital.

109.    Since the probation agreement with the BORM restricted the Defendant, Louis Alfano, Jr., M.D.'s surgical practice to Melrose-Wakefield Hospital, and since he is no longer on the staff of that hospital, the Defendant, Louis Alfano, Jr., M.D., has been removed from surgical practice in the Commonwealth.

110.   However, on December 5, 2007, the Defendant, Louis Alfano, Jr., M.D., filed a Certificate of Organization for a limited liability company "COSMETIC LASER MED SPA, LLC" which upon information and belief has a place of business at 44 Mall Road, Suite G20, Burlington, Massachusetts. (Exhibit 12)

111.   The Certificate of Organization for "COSMETIC LASER MED SPA, LLC" specifically states, "THIS LIMITED LIABILITY COMPANY WILL NOT BE PRACTICING MEDICINE AND WILL NOT BE PERFORMING ANY ACTIVITIES THAT REQUIRE REGISTERING WITH THE MASSACHUSETTS BOARD OF MEDICINE". (Exhibit 12)

112.   Upon information and belief, COSMETIC LASER MED SPA, L.L.C., operates as an entity called "The Cosmetic Laser Clinic" or "LaserDocs.com".

113.   The Cosmetic Laser Clinic advertises itself as "Safety – Quality – Integrity" and offers services including "Cosmetic Surgery" and "Outpatient Procedures Done Under Local Anesthetic" such as "Facelift", "Breast lift", "Eyelift", and "Nose Resculpture".

114.   After the BORM disciplined the Defendant, Louis Alfano, Jr., M.D., and after he was no longer a big shot in the Melrose community, the only evidence of the American Board of Abdominal Surgery, Inc., and the American Society of Abdominal Surgery, Inc., is a nondescript mail drop at 824 Main Street, Melrose, Massachusetts. (Exhibit 13)

115.   Clearly, the sole purpose of the American Board of Abdominal Surgery, Inc., and the American Society of Abdominal Surgery, Inc., was to provide a façade for the Defendant, Louis Alfano, Jr., M.D.'s professional exploits.

### *Louis Alfano, Jr., M.D., Meets Raymond DiGiovanni*

116.   Raymond DiGiovanni was born on July 29, 1924.

117.   Mr. DiGiovanni worked all his life as a laborer in the construction industry. He was also an accomplished saxophone player who used the stage name "Ray Digg". A few years before he died, he retired from the construction industry and worked for the City of Revere Public Works Department where he sometimes worked around sewers and drains. He finally retired when a large snow plow fell onto his foot and partially amputated several toes.

118.   Mr. DiGiovanni never drank alcohol and regularly scolded those who did.

119.   Raymond DiGiovanni was in good health until approximately February 3, 1995, when he developed vague symptoms of fatigue, upper abdominal discomfort, belching, and heartburn. One week later, Mr. DiGiovanni developed dark urine.

120.   On February 13, 1995, Mr. DiGiovanni saw his primary care physician, Dr. Ketro, who noted that Mr. DiGiovanni was jaundiced, and therefore ordered blood tests and a CT scan of his abdomen.

121.   The blood tests showed that Mr. DiGiovanni's total serum bilirubin was 12.6, which is a markedly elevated level, and that he had been exposed to Hepatitis A, a virus often found in sewage, and Hepatitis B.

122.   The blood tests did not show any evidence of kidney disease.

123.   Other laboratory tests, including liver function tests, were interpreted as being "suggestive" of obstructive jaundice, a condition caused by an obstruction to the flow of bile from the liver. However, on February 16, 1995, Mr. DiGiovanni underwent a CT scan of the abdomen and pelvis that showed no gallstones or tumor, the two most frequent causes of obstructive jaundice.

124.   On Friday, February 17, 1995, Mr. DiGiovanni underwent an Endoscopic Retrograde Cholangiogram (hereinafter "ERCP"), a procedure by which dye is injected directly into the bile ducts to determine if the ducts are obstructed. The ERCP showed no gallstones, tumor or other obstruction in the bile ducts.

125.   On February 23, 1995, a subsequent blood test showed that Mr. DiGiovanni's bilirubin level was 6.8, a significant movement back towards normal that demonstrated clear improvement of his condition.

126.   On March 1, 1995, notwithstanding the improvement in Mr. DiGiovanni's condition, the Defendant, Louis Alfano, Jr., M.D., assisted by Alfonso Serrano, M.D., performed unwarranted laparoscopic surgery to remove Raymond DiGiovanni's gallbladder. The operation was unwarranted and unnecessary in light of the significant improvement in the Mr. DiGiovanni's bilirubin level and the lack of an obstruction in the bile ducts.

127.   The Defendant, Louis Alfano, Jr., M.D., performed the operation in a negligent fashion and thus caused Raymond DiGiovanni to suffer enormous internal bleeding that went untreated during the surgery. Mr. DiGiovanni would die of this surgical complication within twenty four (24) hours.

128.   In the immediate post-operative course, Raymond DiGiovanni showed the unmistakable signs of internal bleeding, which is a surgical catastrophe if not controlled. As a result of this internal bleeding, Raymond DiGiovanni required over thirty (30) units of blood products, including twelve (12) units of red blood cells, to survive the night. He eventually succumbed on March 2, 1995, twenty four (24) hours after surgery.

129.   In order to conceal his surgical malpractice, the Defendant, Louis Alfano, Jr., M.D., told the plaintiff, Barbara Circiello, and other members of Raymond DiGiovanni's family, that, although his operation was a success, he unexpectedly found a severely diseased and cirrhotic liver that was imminently lethal.

130.   Dr. Alfano fraudulently represented to the Plaintiff and the DiGiovanni family that Raymond DiGiovanni would have died in the next day or two, even if the surgery had not been performed, from end stage liver disease, which was so advanced that the Defendant, Louis Alfano, Jr., M.D., had no idea how Raymond DiGiovanni "was even walking around" prior to surgery.

131.   Raymond DiGiovanni died from the uncontrolled bleeding that was caused by the Defendant, Louis Alfano, Jr., M.D.'s negligence in the performance of an unnecessary and unwarranted surgery, and not from cirrhosis or liver failure or kidney failure as described by Dr. Alfano.

132.   After Raymond DiGiovanni's death, the family secured the services of a funeral director, Louis Vazza, Sr. of Revere, Massachusetts. Mr. Vazza prepared a Death Certificate by filling in non-medical information on the upper portion of the Death Certificate, and then went to Melrose-Wakefield Hospital to pick up the body of Raymond DiGiovanni. (Exhibit 14)

133.   At Melrose-Wakefield Hospital, Alfonso Serrano, M.D., filled in the medical information on the lower portion of the Death Certificate, which had been prepared by Mr. Vazza. Dr. Serrano signed the death certificate, indicating that Raymond DiGiovanni had "liver failure" for "48 hr.". He also indicated that Raymond DiGiovanni had "liver cirrhosis" and that "kidney failure" was a significant condition contributing to Raymond DiGiovanni's death. Dr. Serrano indicated on the Death Certificate that his license number was 39133. (Exhibit 15)

134.   Mr. Vazza then filed the Death Certificate at Melrose City Hall as per his usual practice.

135.   Sometime later, the Defendant, Louis Alfano, Jr., M.D., prepared and signed a ***second*** Death Certificate. This second Death Certificate incorrectly lists the Defendant, Louis Alfano, Jr., M.D.'s license number as 39133, the same license number that Dr. Serrano used. The second Death Certificate states that Raymond DiGiovanni had "liver cirrhosis, severe." (Exhibit 16)

136.   The Defendant, Louis Alfano, Jr., M.D.'s medical license number is 50341.

137.   Alfonso Serrano, M.D., and the Defendant, Louis Alfano, Jr., M.D., stated that Raymond. DiGiovanni had liver failure for 48 hours to avoid reporting his death to the medical examiner as required by M.G.L. c.38 §§ 3(11)-3(13).

138.   Relying on the Defendant, Louis Alfano, Jr., M.D.'s fraudulent representations concerning Raymond DiGiovanni's condition prior to surgery and the cause of his death, the Plaintiff, Barbara Circiello, was dissuaded and prevented from initiating a claim for medical malpractice against Dr. Alfano and others.

### *The Board of Registration in Medicine Investigates the Defendant, Louis Alfano, Jr., M.D.*

139.   A patient of the Defendant, Louis Alfano, Jr., M.D., referred to here and by the BORM as "Patient A", submitted a complaint to the BORM alleging that the Defendant, Louis Alfano, Jr., M.D., provided substandard medical care, misrepresented the surgery she would undergo, and failed to inform her of complications she sustained during surgery in·2003.

140.   According to publicly available materials provided by the BORM, the following medical
history pertaining to Patient A appears:

a)   Patient A was a 35-year old woman when she consulted with the Defendant,
Louis Alfano, Jr., M.D., for right lower abdominal pain in 1995. Patient A had a
prior history of endometriosis, ulcer disease, cesarean sections, cholecystectomy;
and total abdominal hysterectomy.

b)   An ultrasound suggested appendicitis. The Defendant, Louis Alfano, Jr., M.D.,
planned a laparoscopic appendectomy, but explained to Patient A that a
laparotomy, an open procedure, may have to be performed. He performed a
laparotomy on March 28, 1995.

c)   The care of Patient A was reviewed by a surgical expert retained by the BORM.
The surgical expert wrote that the Defendant, Louis Alfano, Jr., M.D., had "found
'massive adhesions . . . the adhesions were thick in nature.' Appendix was not
inflamed, but [Louis Alfano, Jr., M.D.] dictated 'the diameter of the proximal
appendix which was consistent with the ultrasound findings that the second half
had blown out. However, there was no pus or inflammation of the appendix at this
time.'"

d)   The BORM's surgical expert opined that the Defendant, Louis Alfano, Jr., M.D.'s
explanation quoted in the paragraph above "makes no sense". Pathology revealed
a normal caliber appendix. The defendant, Louis Alfano, Jr., M.D., performed an
adhesiolysis and an incidental appendectomy. No cause for Patient A's abdominal
pain was found.

e)   During the course of his interviews with the BORM, the Defendant, Louis Alfano,
Jr., M.D., claimed that he dictated all of his notes to his nurse who would write
down everything he said. The April 5, 1995 note of Patient A's first postoperative
visit stated, "No problems" yet a wound culture was taken and no examination,
assessment, or plan is documented.

f)   Patient A again visited the Defendant, Louis Alfano, Jr., M.D., on October 17,
1995 complaining of abdominal pain. His documented physical exam and
assessment consisted only of the finding that she had a "sudden increase in
tenderness."

g)   On October 25, 1995, the Defendant, Louis Alfano, Jr., M.D., wrote a consult
letter to Patient A's primary care physician in which he described significant pain
and swelling of the lower abdomen and said that he ordered antacids for possible
duodenitis. There is no visit note in his record for this date and there is nothing
documented in his office record about possible duodenitis. This is one of many
examples of how the Defendant, Louis Alfano, Jr., M.D., created diagnoses out of
thin air. These diagnoses were never supported by laboratory tests or radiological
evidence.

h)      In his interview with the BORM, the Defendant, Louis Alfano, Jr., M.D., admitted that nothing is documented about a visit on October 25, 1995, but he thought he saw Patient A on that day.

i)      Patient A returned to the Defendant, Louis Alfano, Jr., M.D., on October 31, 1995, with the only note in the record of this visit being, "✓ abd. Pain. Same as two weeks ago." The Defendant, Louis Alfano, Jr., M.D., told the interviewer at the BORM that he dictated this note to his nurse. The note does not contain an assessment or a plan. He stated that he ordered a pelvic ultrasound for Patient A, but did not write this order in the record.

j)      This is the last office visit recorded by the Defendant, Louis Alfano, Jr., M.D., in Patient A's medical record until June 2003, despite the fact that he performed several surgical procedures on her in the interim.

k)      In addition, Patient A underwent a pelvic ultrasound in November 1995 and a normal upper gastrointestinal series with small bowel follow-through in February 1997. These tests were both normal and showed no surgically correctable conditions.

l)      Despite these normal studies, in March 1997, the Defendant, Louis Alfano, Jr., M.D., documented that he admitted Patient A to the hospital for surgery for "*lower* abdominal pain, crampiness, and tenderness in the *lower* pelvis," but wrote that his physical examination showed "tenderness in the *upper* abdomen in the area of previous surgeries."

m)      In an attempt to explain this discrepancy in the location of Patient A's pain, the Defendant, Louis Alfano, Jr., M.D., stated in his interview with the BORM that the pain of adhesions can be perceived anywhere.

n)      In March 1997, the Defendant, Louis Alfano, Jr., M.D., planned to perform a diagnostic laparoscopy and adhesiolysis. He obtained Patient A's consent for a laparotomy. He attempted a laparoscopy, but had to convert to a laparotomy when he again found "massive adhesions of the lower abdomen" with adhesions stuck to the abdominal wall and a small serosal tear in the bowel. Of course, he had found these "massive adhesions", a contraindication to laparoscopic abdominal surgery, two years before. Yet, he persisted in using his laparoscope again.

o)      The Defendant, Louis Alfano, Jr., M.D., compiled his operative note one month after the surgery and the discharge summary two months after Patient A's discharge.

p)      The record contains a letter, written by the Defendant, Louis Alfano, Jr., M.D., and addressed to Patient A's place of employment, stating that she was out of work due to the "laparoscopic cholecystectomy" that Louis Alfano, Jr., M.D., performed. However, the Defendant, Louis Alfano, Jr., M.D., never performed a laparoscopic cholecystectomy on Patient A.

q)     On March 12, 1998, Patient A underwent breast screening that showed a "12 x 9-mm solid mass at the 6 o'clock position of the right breast." Thirteen days later, a repeat mammogram and an ultrasound confirmed the presence of a mass in the right breast below the areola, at the 6 o'clock position.

r)     Patient A was referred to the Defendant, Louis Alfano, Jr., M.D., for needle localization and excisional biopsy. In his pre-operative note, he wrote that physical examination did not reveal a palpable lump. However, in the operative note, he described the lump as palpable.

s)     The radiologist localized the mass in the lower right breast, inserted a wire into the mass at the 6 o'clock position and confirmed the localization by mammography.

t)     Patient A was then taken to the operating room for excision of the mass with the wire in place, showing the Defendant, Louis Alfano, Jr., M.D., exactly where to operate.

u)     In his operative note, which was written one month after the surgery, the Defendant, Louis Alfano, Jr., M.D., documented that the wire was in the 12 o'clock position, but he found an area of firmness in the 6 o'clock position. He began by making an incision at the *12 o'clock position* and removed breast tissue from this site. He then moved to the 6 o'clock position and removed the lump.

v)     At the time of his interview with BORM staff, and with the medical record in front of him, the Defendant, Louis Alfano, Jr., M.D., could not explain why he performed the breast excisional biopsy procedure the way he did, nor did he have an explanation as to why he performed the second excision at the 12 o'clock position.

w)     In December 1999, Patient A underwent CT scans of the abdomen and pelvis for abdominal pain. These tests were determined to be "unremarkable."

x)     Despite the unremarkable CT scan, in January 2000, the Defendant, Louis Alfano, Jr., M.D., performed a surgical procedure for Patient A's pain. He did not indicate on the operative report exactly what the procedure was that he performed and the operative note is difficult to interpret. For example, his dictation states that the "incision was made just above the incision."

y)     In his interview with the BORM staff, the Defendant, Louis Alfano, Jr., M.D., stated that the surgical procedure he had performed in January 2000 was a laparoscopic lysis of adhesions.

z)     In his interview with the BORM staff, the Defendant, Louis Alfano, Jr., M.D., stated that his rationale for performing repeated procedures on Patient A in the absence of objective findings was that his surgical procedures relieved her pain for several years. He also claimed to remove adhesions because they can strangulate the bowel.

aa)     On June 3, 2003, Patient A underwent pelvic and abdominal CT scans during an Emergency Department admission for abdominal and pelvic pain. Again, no abnormalities were seen that would explain the pain. However, she did have a small, wide mouth anterior midline supra-umbilical hernia that contained large bowel. No dilated loops of bowel were seen and there was no air or free fluid – findings that would point to a condition treatable by surgery.

bb)     Patient A saw the Defendant, Louis Alfano, Jr., M.D., on June 12, 2003. He noted her chief complaint to be an "incarcerated ventral hernia" but then wrote that-the hernia was reducible and there was no evidence of obstruction. "Incarcerated" and "reducible" are mutually exclusive terms when used to describe a hernia at a single point in time. The Defendant, Louis Alfano, Jr., M.D., documented that he thought that the hernia was causing Patient A's symptoms of crampy pain before and after bowel movements. He planned a *laparoscopic* ventral hernia repair despite his finding "massive adhesions" in previous unsuccessful attempts to perform laparoscopic surgery on Patient A.

cc)     The Defendant, Louis Alfano, Jr., M.D., assisted by his father, Louis Alfano, Sr., M.D., who was at least eighty (80) years old at the time, attempted a laparoscopic lysis of adhesions and abdominal wall hernia repair on Patient A on July 16, 2003.

dd)     The surgical expert who was retained by the BORM to review Patient A's case summarized the Defendant, Louis Alfano, Jr., M.D.'s surgery and noted that his operative report states that he "entered the abdomen using a bladeless trocar. Several other trocars were placed. He used the harmonic scalpel to divide adhesions. An enterotomy was made and the lower midline portion of the incision was opened (not the upper midline area where the incisional hernia was documented by CT scan). Two enterotomies, one colon and one small intestine, were identified and repaired." He irrigated the abdomen, re-examined the abdomen, and closed the abdomen.

ee)     Amazingly, the Defendant, Louis Alfano, Jr., M.D., then re-entered the abdomen with the laparoscope through the previously placed port and proceeded to lyse more adhesions! When asked in his interview why he would re-enter Patient A's abdomen with the laparoscope once he had her opened and closed, a bizarre surgical practice at best, he stated that this is what he always does!

ff)     When asked by the BORM staff during his interview about the ventral hernia that was located above the umbilicus, the Defendant, Louis Alfano, Jr., M.D., denied that Patient A had a hernia above the umbilicus preoperatively. He claimed that it was a postoperative dehiscence, despite the fact that the CT scan showed no change in the hernia preoperatively to postoperatively.

gg)     When asked, the Defendant, Louis Alfano, Jr., M.D., told the BORM staff that he possibly missed the hernia. He claimed, however, that he found an incisional hernia in the abdominal wall at the lower end of Patient A's previous incision and he thought it might contain incarcerated bowel.

hh)    Despite thinking that the hernia might contain bowel, the Defendant, Louis Alfano, Jr., M.D., admitted in his interview that he did not order a bowel prep prior to surgery. Bowel preps clean the colon so that if the colon is inadvertently injured, there will be no fecal contamination in the abdominal cavity.

ii)    Patient A developed a serious infection within the first 24 hours after surgery and was eventually transferred to the intensive care unit. CT scans showed intra-abdominal fluid.

jj)    Patient A initially improved with antibiotic therapy, but then developed an enterocutaneous fistula, which drained feces through her surgical incisions. She was then transferred to Massachusetts General Hospital.

kk)    When asked by the BORM staff, the Defendant, Louis Alfano, Jr., M.D., stated he believed that Patient A was infected postoperatively from "pneumonia".

ll)    The Defendant, Louis Alfano, Jr., M.D., never told Patient A or her husband of the surgical complications he caused during her surgery.

mm)    Patient A and her husband demanded transfer to Massachusetts General Hospital when stool began pouring from her incisions.

nn)    The Defendant, Louis Alfano, Jr., M.D., denied that he created a rent in the transverse colon, but the Massachusetts General Hospital surgeon found that Patient A had "a large gap in the transverse colon." Stool poured out of this rent into Patient A's abdomen and eventually found its way out through the surgical incisions.

oo)    The Defendant, Louis Alfano, Jr., M.D., claimed that the rent was a fistula and that by definition, a fistula is an opening.

pp)    The supra-umbilical ventral hernia noted on the CT scan of June 12, 2003, was never repaired.

qq)    The surgical expert retained by the BORM determined that the Defendant, Louis Alfano, Jr., M.D.'s care of Patient A showed multiple areas of concern and was below the standard of care for a practicing surgeon. Specifically, the expert opined:

    i.    Patient A had chronic abdominal and pelvic pain since she met Louis Alfano, Jr., M.D., and there has never been any radiographic or other evidence to explain her symptoms or to suggest a condition which could be treated by surgery;

    ii.    Despite this lack of findings, the Defendant, Louis Alfano, Jr., M.D., operated on Patient A four times between March 1995 and July 2003 and that it was below the standard of care to even contemplate a laparoscopic approach in a patient who has known adhesions that the Defendant, Louis Alfano, Jr., M.D., described as dense, massive, and thick;

    iii.    Re-entering the abdomen laparoscopically, after the abdomen has been opened, explored and closed, is without medical basis or justification in this circumstance; and

    iv.    There is no documentation as to a reason for the second excision in the breast surgery and opined that this is highly unusual for a practicing surgeon.

141.    In 2006, Patient A filed a medical malpractice suit (MICV2006-02362) against the Defendant, Louis Alfano, Jr., M.D.

142.    Another prior patient of the Defendant, Louis Alfano, Jr., M.D., referred to here and by the BORM as "Patient B", filed a medical malpractice suit against him alleging substandard medical care and failure to provide informed consent in the performance of an invasive surgical procedure in August 2001.

143.    According to publicly available materials provided by the BORM, the following medical history pertaining to Patient B appears:

    a.    On August 23, 2001, Patient B was a 44-year old male who consulted with the Defendant, Louis Alfano, Jr., M.D., about a vasectomy.

    b.    The Defendant, Louis Alfano, Jr., M.D., decided to perform the .procedure in a treatment room in the hospital under local anesthesia on August 23, 2001. Treatment rooms are not to be used for surgical procedures because they are not maintained to the same standards, especially cleanliness, as operating rooms.

    c.    The Defendant, Louis Alfano, Jr., M.D.'s office records and Melrose-Wakefield's records, contained no evidence of a history and physical exam or an operative report. In his interview with BORM staff, the Defendant, Louis Alfano, Jr., M.D., stated that a history and physical is not necessary for a "treatment room case".

    d.    The Defendant, Louis Alfano, Jr., M.D., described Patient B as "very, very large" and "very, very anxious", the very two reasons not to attempt this procedure without suitable anesthesia. He also stated that during the procedure, the patient was anxious and moving about the table. The patient was complaining of discomfort throughout the procedure.

e.   The Defendant, Louis Alfano, Jr., M.D., described the procedure in his interview with the BORM staff. He stated that he started on the left scrotum, removed the vas (the structure which moves sperm forward), and sent the specimen to pathology. He then moved to the right scrotum, infiltrated it, and got what he thought was the vas. He sent that to pathology. He then called down to the pathology lab and heard that, while he had successfully removed the vas on the left, there was no vas in the right sided specimen. The right sided specimen was actually skeletal muscle tissue.

f.   The Defendant, Louis Alfano, Jr., M.D., then told the BORM staff that he thought it was possible that he had, in fact, transected the vas, without getting a piece of it, and that it had retracted back into the tissues, but he could not be sure. He wanted to go back in on the right side to repeat the procedure, but Patient B refused and told him to stop.

g.   Patient B stated in an affidavit that within two hours of leaving the hospital, his scrotum had swelled to the size of a grapefruit, he could not walk, and blood was oozing from between his stitches.

h.   Patient B's wife called the Defendant, Louis Alfano, Jr., M.D.'s office and was told that unless his scrotum was turning black, there was no reason to be alarmed. The Defendant, Louis Alfano, Jr., M.D., later called Patient B's home and advised him to call for an appointment several days later.

i.   Patient B saw the Defendant, Louis Alfano, Jr., M.D., in his office on September 25, 2001. The Defendant, Louis Alfano, Jr., M.D., documented in the record of this visit that Patient B had "some swelling, probably secondary to a hematoma" He instructed Patient B to wear a jock strap and ice the area and he gave him pain medication and antibiotics. However, he did not document his assessment nor did he measure the degree of swelling or document the color.

j.   Patient B saw the Defendant, Louis Alfano, Jr., M.D., again on October 2, 2001. In the record of this visit, he noted that "the hematoma seems to be resolving slowly". However, he instructed Patient B to return in two days for an aspiration and drainage.

k.   Patient B returned to the Defendant, Louis Alfano, Jr., M.D., on October 4, 2001. He documented in his visit note of this date that he drained and cleaned the area.

l.   However, according to a statement by Patient B in an affidavit, the Defendant, Louis Alfano, Jr., M.D., "lanced" the hematoma and started squeezing his scrotum. Patient B could hear something "pop." Each time he squeezed, Patient B could hear the popping sound. Patient B stated that when he sat up, he saw blood and blood clots all over the floor and "long Q-tip swabs, about a foot long each, covered with blood." Patient B claimed that blood was still dripping out of his scrotum. The Defendant, Louis Alfano, Jr., M.D., then told Patient B to go home and take his prescriptions.

m.     Over the ensuing two and one half months, the Defendant, Louis Alfano, Jr., M.D., saw Patient B a total of seven times, making attempts to drain the large collection of blood in the scrotum, which resulted in an infection the scrotal hematoma.

n.     Patient B sought consultation from a urologist on November 30, 2001. The urologist examination found "a fluctuant left hemi-scrotum with serosanguinous drainage from an opening in the mid-scrotum. The left scrotum is approximately three times the size of the right."

o.     Patient B had a 5 cm x 7 cm x 7 cm (about the size of a billiard ball) abscess in his left scrotum that required surgical drainage.

p.     Ultimately, the vasectomy that the Defendant, Louis Alfano, Jr., M.D., performed was not successful in making Patient B sterile. Louis Alfano, Jr., M.D., tried to cover this up by documenting that Patient B had only dead and non-motile sperm. He told the BORM staff that, at the time, he thought Patient B just had to ejaculate more to get rid of the sperm. The pathology reports show that Patient B still had motile sperm six months after the vasectomy.

q.     When final pathology reports ordered by his subsequent treating urologist confirmed the presence of live sperm, Patient B was shocked to learn the vasectomy had not been successful.

r.     The Defendant, Louis Alfano, Jr., M.D., told the BORM staff that he performs 20 - 25 vasectomies per year.

s.     A surgical expert retained by the BORM stated that, in his experience, the vast majority of vasectomies are performed by urologists, and not by general surgeons.

t.     The surgical expert retained by the BORM found that there are several inconsistencies or errors in the Defendant, Louis Alfano, Jr., M.D.'s office notes. There is no documentation of informed consent, and there is no procedure report, either dictated or hand written. The surgical expert opined that these lapses are below the standard of care. The surgical expert also found that the Defendant, Louis Alfano, Jr., M.D., waited too long before doing further investigative studies, like an ultrasound, or before obtaining appropriate consultation.

u.     It was the surgical expert's opinion that the Defendant, Louis Alfano, Jr., M.D., should have recognized the abscess formation in a chronically infected, non-healing wound and that his care of this postoperative infection was below the standard for a practicing surgeon.

v.     The expert retained by the BORM found the Defendant, Louis Alfano, Jr., M.D.'s care to be substandard for several reasons and opined:

i.     very few general surgeons perform elective vasectomies through a scrotal approach and even many urologists do not perform routine elective vasectomy; in the expert's own practice of twelve board-certified urologists, only two perform this procedure electively;

ii.     concern regarding the Defendant, Louis Alfano, Jr., M.D.'s decision to perform the procedure on a very, very large man who was very, very anxious in a treatment room without general anesthesia. Either difficult scrotal anatomy in a markedly obese man or severe anxiety can preclude a safe and successful sterilization under local anesthesia. This is the patient that an experienced vasectomist would schedule under general anesthesia;

iii.     the Defendant, Louis Alfano, Jr., M.D.'s documentation was far too sketchy regarding Patient B's care and findings;

iv.     the Defendant, Louis Alfano, Jr., M.D.'s care was substandard in that he failed to examine Patient B immediately following the procedure when Patient B's wife called him and told him of the swelling. When he finally did examine the patient four days later, he should have recognized the potential seriousness of the complication and arranged to take Patient B to the operating room to evacuate the hematoma and place scrotal drains; and

v.     the several attempts that the Defendant, Louis Alfano, Jr., M.D., made to drain the large collection of blood from the left side resulted in infecting the scrotal hematoma. Patient B would have been better served had he either surgically drained the large scrotal hematoma soon after the vasectomy and had not delayed more than two months while performing needle aspirations, or if he had immediately sought a second opinion for management of this complication.

144.    In 2004 Patient B filed a medical malpractice suit against the Defendant, Louis Alfano, Jr., M.D., and his practice, Melrose Surgical Associates, P.C.

145.    Another prior patient of the Defendant, Louis Alfano, Jr., M.D., referred to here as Ms. Wendy Wass (and by the BORM as "Patient C"), filed a consumer complaint with the BORM alleging substandard medical care, failure to maintain an accurate medical record, failure to provide medical records, and failure to provide accurate procedural information, arising out the Defendant, Louis Alfano, Jr., M.D.'s care of her between 2000 and 2003.

146.    According to publicly available materials provided by the BORM, the following medical history pertaining to Patient C appears:

a.     Ms. Wendy Wass was a 43-year old woman when she started seeing the Defendant, Louis Alfano, Jr., M.D., in 1995.

b.      Ms. Wendy Wass had a long and involved medical and surgical history that included Crohn's disease, hyperlipidemia, hidradenitis, diabetes, and fibromyalgia. Ms. Wass was diagnosed with rectal cancer in 1984 and at that time she underwent resection of her rectum and creation of a colostomy. A large part of her colon was left intact.

c.      Ms. Wendy Wass consulted the Defendant, Louis Alfano, Jr., M.D., for abdominal pain in 1995. All clinical assessments and radiographic studies failed to show any abnormalities.

d.      In January 1996, Ms. Wendy Wass underwent an upper gastro-intestinal series with a small bowel follow-through and an abdominal CT scan. Neither test showed any obstruction or active Crohn's disease.

e.      On February 15, 1996, despite lack of objective findings, the Defendant, Louis Alfano, Jr., M.D., performed a laparoscopic lysis of adhesions for her abdominal pain.

f.      In December 1996, the Defendant, Louis Alfano, Jr., M.D., again admitted Ms. Wendy Wass for surgery. His dictated history and physical states that the patient had a prior total colectomy and ileostomy for Crohn's disease. Ms. Wass actually has a colostomy, not an ileostomy.

g.      The surgical expert retained by the BORM stated that the Defendant, Louis Alfano, Jr., M.D., incorrectly dictated that the patient had a prior total colectomy and an ileostomy; when, in fact, she had a prior colostomy.

h.      The surgical expert retained by the BORM noted that the Defendant, Louis Alfano, Jr., M.D.'s dictated operative report shows her preoperative diagnosis as "stenosis of ileostomy" and documented the procedure that he performed as "revision of ileostomy." The pathology report confirmed that he had actually operated on a colostomy because the sample that he submitted to the pathologist was indeed colon (large bowel), and not ileum (small bowel).

i.      In May 2000, the Defendant, Louis Alfano, Jr., M.D., performed a third operation, a laparoscopic lysis of adhesions, for abdominal pain. According to his operative note, the patient requested "no laparotomy" (open procedure), so he therefore performed an incomplete adhesiolysis.

j.      Ms. Wendy Wass told the Defendant, Louis Alfano, Jr., M.D., that she would prefer to have a laparoscopy. She never refused a laparotomy.

k.      Although Ms. Wendy Wass' abdominal pain resolved for a few months after the surgery in May 2000, it had returned by November 2000. On November 11, 2000, Ms. Wendy Wass underwent abdominal and pelvic CT scans and on December 7, 2000, an upper gastrointestinal series and small bowel follow through.

l.      All of these studies were without significant findings. Specifically, Ms. Wendy Wass did not have any obstruction and she did not have an incisional hernia with incarcerated small intestine.

m.      On November 13, 2002, Ms. Wendy Wass visited with her gastroenterologist and his physical exam did not reveal a hernia. She also had a colonoscopy, upper gastrointestinal series with small bowel follow through and endoscopy performed by her gastroenterologist on this date. None of these studies showed an incisional hernia or incarcerated small bowel.

n.      On December 12, 2002, Ms. Wendy Wass saw the Defendant, Louis Alfano, Jr., M.D., in his office. His impression was that she had adhesions and he planned a laparoscopic, or possible open, lysis of adhesions for abdominal pain. His notes do not mention an incisional hernia.

o.      The Defendant, Louis Alfano, Jr., M.D., admitted Ms. Wendy Wass for a fourth surgery for chronic abdominal pain on January 13, 2003. In his operative note, the Defendant, Louis Alfano, Jr., M.D., wrote that Ms. Wass had an ileostomy, but she actually had a colostomy. He also wrote that she had a hernia defect in an old scar with incarcerated small bowel. This is the first time that a hernia defect was mentioned. The physical examination, small bowel study and the endoscopies performed by her gastroenterologist did not reveal the serious condition of incarcerated bowel.

p.      By May 2003, Ms. Wendy Wass again had abdominal pain.

q.      The BORM retained a surgical expert who opined that the Defendant, Louis Alfano, Jr., M.D.'s care of Ms. Wendy Wass was substandard in that:

    i.      he performed three surgical procedures for abdominal pain without clinical or radiographic evidence of obstruction or abnormality. After each operation, Ms. Wendy Wass' pain returned within months of surgery;

    ii.     the practice of adhesiolysis for chronic abdominal pain without objective abnormalities is questionable at best;

    iii.    the repeated performance of lysis procedures on a patient, in whom the improvement of symptoms is so short-lived, is highly questionable and below the standard of care;

    iv.     the Defendant, Louis Alfano, Jr., M.D., made incorrect and inconsistent descriptions of Ms. Wendy Wass' stoma. He incorrectly documented in several places in Ms. Wendy Wass' medical record that she had a colectomy and ileostomy, but in other places, he correctly documented a colostomy;

v.        he performed a revision Ms. Wendy Wass' stoma and wrote that he revised her ileostomy when, in fact, he had revised her colostomy stoma; and

vi.       this incorrect and inconsistent recording is concerning in a practicing surgeon and is below the standard of care.

147.    The surgical expert stated that he was confused as to Ms. Wendy Wass' surgical history until he read the reports and notes by her gastroenterologist who correctly and consistently confirmed that she had a colostomy and not an ileostomy.

### The RICO Enterprise

148.    Melrose-Wakefield Hospital, the American Board of Abdominal Surgeons, Inc., Louis Alfano, Sr., M.D., David Brooks, M.D., Alfonso Seranno, M.D., Melrose Surgical Associates, P.C., and the Medical Liability Mutual Insurance Company, as an association-in-fact, formed a RICO enterprise or syndicate.

149.    This enterprise was the instrumentality by which the Defendants, Louis Alfano, Jr., M.D., and Melrose-Wakefield Hospital, defrauded the Plaintiff, Barbara Circiello.

150.    David Brooks, M.D., is a surgeon, board certified by the ABS, and serves as the Director of Minimally Invasive Surgery at Boston's Brigham and Women's Hospital. (Exhibit 17, page 2)

151.    David Brooks, M.D., using his position at and the prestige of, the Brigham and Women's Hospital, makes considerable income by acting as a "medical expert". Dr. Brooks defends the Defendant, Louis Alfano, Jr., M.D., when he was/is accused by his patients, and the BORM, of medical negligence.

152.    David Brooks, M.D., examined the records of Patient A, Patient B and Patient C, Ms. Wendy Wass, and reviewed the opinions of the expert retained by the BORM. (Exhibit 17, page 2)

153.    David Brooks, M.D., reported numerous differences of opinion with the BORM's reviewer and challenged a number of that reviewer's primary criticisms of the Defendant, Louis Alfano, Jr., M.D. (Exhibit 17, page 2)

154.    In documents filed with the BORM, David Brooks, M.D., adamantly defended the Defendant, Louis Alfano, Jr., M.D.'s care of Patient A, Patient B, and Patient C, Ms. Wendy Wass.

155.    In addition, David Brooks, M.D., has defended the Defendant, Louis Alfano, Jr., M.D.'s actions in other medical malpractice claims against him.

156.    The Defendant, Louis Alfano, Jr., M.D., has represented to the BORM that Dr. Brooks, as a surgical administrator at Brigham and Women's Hospital, is responsible for assuring the safety and welfare patients at the Brigham and Women's Hospital. The Defendant, Louis Alfano, Jr., M.D., further represents to the BORM that in the spirit of that responsibility, Dr. Brooks states that after reviewing the records of Patient A, Patient B and Patient C, he found that the Defendant, Louis Alfano, Jr., M.D., did not represent a threat to his patients and opined that he should be allowed to resume operating once again. (Exhibit 17, page 2)

157.    David Brooks, M.D., disagreed with the BORM's expert's opinion that Louis Alfano, Jr., M.D.'s decision to reinitiate a laparoscopic procedure after completing an open procedure is "unheard of and is without medical basis or justification". Dr. Brooks told the BORM that he disagrees with such a conclusion and stated that he finds "no basis for this complaint and believe(s) it was a perfectly reasonable approach." (Exhibit 17, page 4, footnote 6)

158.    David Brooks, M.D.'s role in the enterprise was to defend Louis Alfano, Jr., M.D., by providing paid for "expert" testimony to obfuscate his incompetence and negligence so that his injured patients and their families, and even the BORM, could not prosecute Louis Alfano, Jr., M.D., without incurring significant costs in resources or time.

159.    David Brooks, M.D., used his position to urge the BORM into unleashing the Defendant, Louis Alfano, Jr., M.D., on an unsuspecting public, knowing full well that he was an incompetent surgeon.

160.    As late as January 24, 2007, Melrose-Wakefield Hospital was still willing to allow the Defendant, Louis Alfano, Jr., M.D., to operate on unsuspecting patients despite the fact that he was a defendant in three medical malpractice suits and was under investigation by the BORM. (Exhibit 17, page 1 and page 5, footnote 7)

161.    Melrose-Wakefield Hospital never questioned

    a.    why the Defendant, Louis Alfano, Jr., M.D., was performing operations in its treatment rooms;

    b.    why patients were being transferred to tertiary care hospitals for life saving treatment after being butchered by the Defendant, Louis Alfano, Jr., M.D.;

    c.    why operative reports, pathology reports and other medical records did not correspond to patients' actual conditions;

    d.    why the Defendant, Louis Alfano, Jr., M.D., was performing surgery without any preoperative tests; and

    e.    why the Defendant, Louis Alfano, Jr., M.D., was performing surgery when preoperative tests showed no surgically treatable conditions;

162.   Even in 2008, Melrose-Wakefield Hospital still covers up for the Defendant, Louis Alfano, Jr., M.D. When Melrose-Wakefield Hospital was asked about the nature of the relationship between itself and Louis Alfano, Jr., M.D., in 1995, the Hospital's attorney stated, "Dr. Alfano held medical staff privileges in March of 1995." (Exhibit 18) However, according to Louis Alfano, Jr., M.D.'s curriculum vitae, he was "President of Melrose-Wakefield Hospital, 1994 to 1996" and not just a staff physician. (Exhibit 4)

163.   MLMIC was an influential member of this syndicate. This organization provided the funding for the ridiculous defenses concocted for the Defendant, Louis Alfano, Jr., M.D., when his liability was remarkably clear.

164.   The Defendant, Louis Alfano, Jr., M.D., represented to the BORM that he could not admit "that he engaged in substandard care on numerous occasions" because "the required admission would be to cause a judgment to be entered against him" and presumably result in significant losses for the Medical Liability Mutual Insurance Company. (Exhibit 17, page 5, top, and footnote 7)

## COUNT ONE-RICO

165.   The Plaintiff, Barbara Circiello, repeats and realleges each of the allegations contained in paragraphs 1 through 164 as if fully set forth herein.

166.   At all relevant times, the Plaintiff, Barbara Circiello was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

167.   At all relevant times, the Defendants, Louis Alfano, Jr., M.D., and Hallmark Health Systems, Inc., and the Conspirators, Melrose-Wakefield Hospital, Louis Alfano, Sr., M.D., the American Board of Abdominal Surgery, Alfonso Serrano, M.D., the Medical Liability Mutual Insurance Company and David Brooks, M.D., were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

168.   At all relevant times, the Defendants Louis Alfano, Jr., M.D., and Hallmark Health Systems, Inc., and the Conspirators, Melrose-Wakefield Hospital, Louis Alfano, Sr., M.D., the American Board of Abdominal Surgery, Alfonso Serrano, M.D., the Medical Liability Mutual Insurance Company and David Brooks, M.D., formed an association-in-fact for the purpose of defrauding the Plaintiff, Barbara Circiello. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. §§ 1961(4).

169.   At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

170.   At all relevant times, the Defendants Louis Alfano, Jr., M.D., and Hallmark Health Systems, Inc., and the Conspirators, Melrose-Wakefield Hospital, Louis Alfano, Sr., M.D., the American Board of Abdominal Surgery, Alfonso Serrano, M.D., the Medical Liability Mutual Insurance Company and David Brooks, M.D., associated with this enterprise, conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

171.   Specifically, at all relevant times, the Defendants Louis Alfano, Jr., M.D., and Hallmark Health Systems, Inc., and the Conspirators, Melrose-Wakefield Hospital, Louis Alfano, Sr., M.D., the American Board of Abdominal Surgery, Alfonso Serrano, M.D., the Medical Liability Mutual Insurance Company and David Brooks, M.D., engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth above. The acts set forth above constitute a violation of one or more of the following statues: 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); and 18 U.S.C. § 1512 (tampering with records). Louis Alfano, Jr., M.D., Hallmark Health Systems, Inc., and the Conspirators, Melrose-Wakefield Hospital, Louis Alfano, Sr., M.D., the American Board of Abdominal Surgery, Alfonso Serrano, M.D., the Medical Liability Mutual Insurance Company and David Brooks, M.D., each committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

172.   The acts of racketeering activity referred to in the previous paragraph constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5). The acts alleged were related to each other by virtue of common participants, a common victim (the Plaintiff, Barbara Circiello), a common method of commission, and the common purpose and common result of defrauding the Plaintiff, Barbara Circiello of $10 million and enriching the Conspirators, Melrose-Wakefield Hospital, Louis Alfano, Sr., M.D., the American Board of Abdominal Surgery, Alfonso Serrano, M.D., the Medical Liability Mutual Insurance Company and David Brooks, M.D., at the Plaintiff, Barbara Circiello's expense, while concealing the Conspirator's fraudulent activities. The fraudulent scheme continued for over thirteen years until August 2007 and threatened to continue longer but for the actions of the BORM.

173.   As a direct and proximate result of the Defendants, Louis Alfano, Jr., M.D.'s and Hallmark Health Systems, Inc.'s and the Conspirators, Melrose-Wakefield Hospital's, Louis Alfano, Sr., M.D.'s, the American Board of Abdominal Surgery's, Alfonso Serrano, M.D.'s, the Medical Liability Mutual Insurance Company's, and David Brooks, M.D.'s violation of RICO, 18 U.S.C. § 1962(c), the Plaintiff, Barbara Circiello, lost over $10 million, representing the reasonable recovery for the Wrongful Death of Raymond DiGiovanni.

174.   As a result of their misconduct, the Defendants, Louis Alfano, Jr., M.D., and Hallmark Health System, Inc., are liable to the Plaintiff, Barbara Circiello, for her losses in an amount to be determined at trial.

175.   Pursuant to RICO, 18 U.S.C. § 1964(c), the Plaintiff, Barbara Circiello, is entitled to recover threefold her damages plus costs and attorneys' fees from the Defendants, Louis Alfano, Jr., M.D., and Hallmark Health System, Inc.

## COUNT TWO-RICO CONSPIRACY

176. The Plaintiff, Barbara Circiello, repeats and realleges each of the allegations contained in paragraphs 1 through 175 as if fully set forth herein.

177. At all relevant times, the Plaintiff, Barbara Circiello, was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

178. At all relevant times, the Defendants, Louis Alfano, Jr., M.D., and Hallmark Health Systems, Inc., and the Conspirators, Melrose-Wakefield Hospital, Louis Alfano, Sr., M.D., the American Board of Abdominal Surgery, Alfonso Serrano, M.D., the Medical Liability Mutual Insurance Company and David Brooks, M.D., were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

179. At all relevant times, the Defendants, Louis Alfano, Jr., M.D., and Hallmark Health Systems, Inc., and the Conspirators, Melrose-Wakefield Hospital, Louis Alfano, Sr., M.D., the American Board of Abdominal Surgery, Alfonso Serrano, M.D., the Medical Liability Mutual Insurance Company and David Brooks, M.D., formed an association-in-fact for the purpose of defrauding the Plaintiff, Barbara Circiello. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. §§ 1961(4).

180. At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

181. As set forth in COUNT ONE, the Defendants, Louis Alfano, Jr., M.D., and Hallmark Health Systems, Inc., and the Conspirators, Melrose-Wakefield Hospital, Louis Alfano, Sr., M.D., the American Board of Abdominal Surgery, Alfonso Serrano, M.D., the Medical Liability Mutual Insurance Company and David Brooks, M.D., associated with this enterprise, conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

182. At all relevant times, the Defendants, Louis Alfano, Jr., M.D., and Hallmark Health Systems, Inc., and the Conspirators, Melrose-Wakefield Hospital, Louis Alfano, Sr., M.D., the American Board of Abdominal Surgery, Alfonso Serrano, M.D., the Medical Liability Mutual Insurance Company and David Brooks, M.D., each were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

183. The Defendants, Louis Alfano, Jr., M.D., and Hallmark Health Systems, Inc., and the Conspirators, Melrose-Wakefield Hospital, Louis Alfano, Sr., M.D., the American Board of Abdominal Surgery, Alfonso Serrano, M.D., the Medical Liability Mutual Insurance Company and David Brooks, M.D., committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

184.    As a direct and proximate result of the Defendants, Louis Alfano, Jr., M.D.'s and Hallmark Health Systems, Inc.'s, and the Conspirators, Melrose-Wakefield Hospital's, Louis Alfano, Sr., M.D.'s, the American Board of Abdominal Surgery's, Alfonso Serrano, M.D.'s, the Medical Liability Mutual Insurance Company's, and David Brooks, M.D.'s violation of RICO, 18 U.S.C. § 1962(d), the Plaintiff, Barbara Circiello, lost over $10 million, representing the reasonable recovery for the Wrongful Death of Raymond DiGiovanni.

185.    As a result of the conspiracy, Louis Alfano, Jr., M.D., and Hallmark Health System, Inc., are liable to the Plaintiff, Barbara Circiello, for her losses in an amount to be determined at trial.

186.    Pursuant to RICO, 18 U.S.C. § 1964(c), the Plaintiff, Barbara Circiello, is entitled to recover threefold her damages plus costs and attorneys' fees from the Defendants, Louis Alfano, Jr., M.D., and Hallmark Health System, Inc.

## COUNT THREE-INTENTIONAL MISREPRESENTATION, COMMON LAW FRAUD

### Barbara Circiello v. Louis Alfano, Jr., M.D.

187.    The Plaintiff, Barbara Circiello, repeats and re-avers each of the allegations contained in paragraphs 1 through 186 as if separately set forth herein.

188.    In and around March 1995, the Defendant, Louis Alfano, Jr., M.D. intentionally made false and/or misleading statements and/or intentional omissions directly to the DiGiovanni family and in Raymond DiGiovanni's health care records concerning his cause of death, his condition prior to March 1, 1995, and his condition after March 1, 1995.

189.    These false statements and intentional omissions are contained in Raymond DiGiovanni's medical record of February 1995 through March 1995 and the Death Certificates indicating that Raymond DiGiovanni died from liver failure, liver cirrhosis and renal failure.

190.    Medical record notations created by and/or dictated by the Defendant, Louis Alfano, Jr., M.D., were materially inaccurate and incomplete with regard to the Raymond DiGiovanni's condition and cause of death.

191.    The Defendant, Louis Alfano, Jr., M.D., breached his fiduciary duty to the plaintiff, Barbara Circiello and to Raymond DiGiovanni by intentionally failing to dictate and/or keep and/or to maintain complete and accurate medical records for Raymond DiGiovanni.

192.    The defendant, Louis Alfano, Jr., M.D., breached his fiduciary duty to the plaintiff, Barbara Circiello and to Raymond DiGiovanni by intentionally dictating and/or maintaining and/or making false representations of material facts relating to Raymond DiGiovanni's condition and cause of death.

193.    As a result of the Defendant, Louis Alfano, Jr., M.D.'s intentional misrepresentations, the Plaintiff, Barbara Circiello, was dissuaded and prevented from investigating a claim of medical malpractice against Dr. Alfano. Had such an investigation been commenced, it would have shown that Mr. DiGiovanni died as the direct result of Dr. Alfano's negligence.

## COUNT FOUR-INTENTIONAL MISREPRESENTATION, COMMON LAW FRAUD

### Barbara Circiello v. Hallmark Health Systems, Inc.

194.    The Plaintiff, Barbara Circiello, repeats and re-avers each of the allegations contained in paragraphs 1 through 193 as if separately set forth herein.

195.    In and around March 1995, the Defendant, Hallmark Health Systems, Inc., knowingly allowed the Defendant, Louis Alfano, Jr., M.D., to intentionally make false and/or misleading statements and/or intentional omissions in Raymond DiGiovanni's health care records concerning his cause of death, his condition prior to March 1, 1995, and his condition after March 1, 1995.

196.    These statements and/or omissions include, but are not limited to, the defendant's medical record of February 1995 through March 1995 and the Death Certificates.

197.    The Defendant, Hallmark Health Systems, Inc., knew that medical record notations created by and/or dictated by the Defendant, Louis Alfano, Jr., M.D., were materially inaccurate and incomplete with regard to Raymond DiGiovanni's condition and cause of death.

198.    The Defendant, Hallmark Health Systems, Inc., breached its fiduciary duty to the Plaintiff, Barbara Circiello, and to Raymond DiGiovanni, by intentionally failing to insure that the Defendant, Louis Alfano, Jr., M.D., dictated and/or kept and/or maintained complete and accurate medical records for Raymond DiGiovanni.

199.    The Defendant, Hallmark Health Systems, Inc., breached its fiduciary duty to the Plaintiff, Barbara Circiello, and to Raymond DiGiovanni, by knowingly allowing the Defendant, Louis Alfano, Jr., M.D., to dictate and/or maintain and/or make false representations of material facts relating to Raymond DiGiovanni's condition and cause of death.

200.    As a result of the Defendant, Louis Alfano, Jr., M.D.'s intentional misrepresentations, the Plaintiff, Barbara Circiello, was dissuaded and prevented from investigating a claim of medical malpractice against Dr. Alfano. Had such an investigation been commenced, it would have shown that Mr. DiGiovanni died as the direct result of Dr. Alfano's negligence.

## COUNT FIVE-FRAUDULENT CONCEALMENT

### (Barbara Circiello v. Louis Alfano, Jr., M.D.)

201.    The Plaintiff, Barbara Circiello, repeats and re-avers each of the allegations contained in paragraphs 1 through 200 as if separately set forth herein.

202.    In and around February 1995 through March 1995, the Defendant, Louis Alfano, Jr., M.D., intentionally made false and/or misleading statements and/or intentional omissions orally and in Raymond DiGiovanni's health care records and Death Certificates concerning his medical condition and cause of death.

203. These statements and/or omissions include, but are not limited to, the defendant's medical record of February 1995 through March 1995 and the Death Certificates.

204. Medical record notations made and/or dictated by the Defendant, Louis Alfano, Jr., M.D., were materially inaccurate and incomplete with regard to Raymond DiGiovanni's medical condition and cause of death.

205. The Defendant, Louis Alfano, Jr., M.D., breached his fiduciary duty to the Plaintiff, Barbara Circiello, and to Raymond DiGiovanni, by intentionally failing to dictate and/or keep and/or maintain complete and accurate medical records for Raymond DiGiovanni.

206. The Defendant, Louis Alfano, Jr., M.D., breached his fiduciary duty to the Plaintiff, Barbara Circiello, and to Raymond DiGiovanni, by intentionally dictating and/or maintaining and/or making false representations of material facts relating to Raymond DiGiovanni's medical condition and cause of death.

207. The Defendant, Louis Alfano, Jr., M.D., breached his fiduciary duty to the Plaintiff, Barbara Circiello, and to Raymond DiGiovanni, by intentionally misstating and/or concealing material medical information in the plaintiff's decedent's medical records that would disclose to the Plaintiff, Barbara Circiello, facts that would give rise to knowledge of a cause of action for wrongful death.

208. As a result of the Defendant, Louis Alfano, Jr., M.D.'s fraudulent concealment of the true cause of Raymond DiGiovanni's death, the Plaintiff, Barbara Circiello, was dissuaded and prevented from investigating a claim of medical malpractice against Dr. Alfano. Had such an investigation been commenced, it would have shown that Mr. DiGiovanni died as the direct result of Dr. Alfano's negligence.

## COUNT SIX-FRAUDULENT CONCEALMENT

### (Barbara Circiello v. Hallmark Health Systems, Inc.)

209. The Plaintiff, Barbara Circiello, repeats and re-avers each of the allegations contained in paragraphs 1 through 208 as if separately set forth herein.

210. In and around February 1995 through March 1995, the Defendant, Hallmark Health Systems, Inc., allowed the Defendant, Louis Alfano, Jr., M.D., to intentionally make false and/or misleading statements and/or intentional omissions in Raymond DiGiovanni's health care records and Death Certificates concerning his medical condition and cause of death.

211. These statements and/or omissions include, but are not limited to, the defendant's medical record of February 1995 through March 1995 and the Death Certificates.

212. The Defendant, Hallmark Health Systems, Inc., knew that the medical record notations made and/or dictated by the Defendant, Louis Alfano, Jr., M.D., were materially inaccurate and incomplete with regard to Raymond DiGiovanni's medical condition and cause of death.

213.    The Defendant, Hallmark Health Systems, Inc., breached its fiduciary duty to the Plaintiff, Barbara Circiello, and to Raymond DiGiovanni, by intentionally failing to insure that the Defendant, Louis Alfano, Jr., M.D., dictated and/or kept and/or maintained complete and accurate medical records for Raymond DiGiovanni.

214.    The Defendant, Hallmark Health Systems, Inc., breached its fiduciary duty to the Plaintiff, Barbara Circiello, and to Raymond DiGiovanni, by knowingly allowing the Defendant, Louis Alfano, Jr., M.D., to dictate and/or maintain and/or make false representations of material facts relating to Raymond DiGiovanni's medical condition and cause of death.

215.    The Defendant, Hallmark Health Systems, Inc., breached its fiduciary duty to the Plaintiff, Barbara Circiello, and to Raymond DiGiovanni, by intentionally and knowingly allowing the Defendant, Louis Alfano, Jr., M.D., to misstate and/or conceal material medical information in Raymond DiGiovanni's medical records that would disclose to the Plaintiff, Barbara Circiello, facts that would give rise to knowledge of a cause of action for wrongful death.

216.    As a result of the Defendant, Louis Alfano, Jr., M.D.'s fraudulent concealment of the true cause of Raymond DiGiovanni's death, the Plaintiff, Barbara Circiello, was dissuaded and prevented from investigating a claim of medical malpractice against Dr. Alfano. Had such an investigation been commenced, it would have shown that Mr. DiGiovanni died as the direct result of Dr. Alfano's negligence.

## V.    **DEMANDS FOR RELIEF**

A.    The plaintiff, Barbara Circiello, prays for a judgment in her favor, awarding her damages, including compensatory, treble, and punitive damages, interest costs, expenses and attorneys' fees incurred in prosecuting this action, as well as pre-judgment and post-judgment interest, in an amount to be determined at trial as to the First Cause of Action.

B.    The plaintiff, Barbara Circiello, prays for a judgment in her favor, awarding her damages, including compensatory, treble, and punitive damages, interest costs, expenses and attorneys' fees incurred in prosecuting this action, as well as pre-judgment and post-judgment interest, in an amount to be determined at trial as to the Second Cause of Action.

C.    The plaintiff, Barbara Circiello, prays for a judgment in her favor, awarding her damages, including compensatory, treble, and punitive damages, interest costs, expenses and attorneys' fees incurred in prosecuting this action, as well as pre-judgment and post-judgment interest, in an amount to be determined at trial as to the Third Cause of Action.

D.    The plaintiff, Barbara Circiello, prays for a judgment in her favor, awarding her damages, including compensatory, treble, and punitive damages, interest costs, expenses and attorneys' fees incurred in prosecuting this action, as well as pre-judgment and post-judgment interest, in an amount to be determined at trial as to the Fourth Cause of Action.

E.      The plaintiff, Barbara Circiello, prays for a judgment in her favor, awarding her damages, including compensatory, treble, and punitive damages, interest costs, expenses and attorneys' fees incurred in prosecuting this action, as well as pre-judgment and post-judgment interest, in an amount to be determined at trial as to the Fifth Cause of Action.

F.      The plaintiff, Barbara Circiello, prays for a judgment in her favor, awarding her damages, including compensatory, treble, and punitive damages, interest costs, expenses and attorneys' fees incurred in prosecuting this action, as well as pre-judgment and post-judgment interest, in an amount to be determined at trial as to the Sixth Cause of Action.

## VI.    JURY CLAIM

The plaintiff claims a trial by jury.

Respectfully submitted,
The Plaintiff,
By her attorney,


/s/ Domenic Paolini
_____
Domenic Paolini
BBO # 643215
**PAOLINI & HALEY**
Marketplace Center 3 North
200 State Street
Boston, MA 02109
(617) 951-0300